**MAHER & PITTELL, LLP**
ATTORNEYS AT LAW

*Reply To:*                                                           *Long Island Office*
**42-40 Bell Blvd,  Suite 302**                            **10 Bond St,  Suite 389**
**Bayside, New York  11361**                       **Great Neck, New York  11021**
**Tel (516) 829-2299**                                          **Tel  (516) 829-2299**
*jp@jpittell.com*                                                     *jp@jpittell.com*

January 4, 2024

Hon. Kimba M. Wood
U.S. District Court
500 Pearl St.
New York, NY 10017

Re:    *U.S. v. Belmar,* 21 cr 16 (KMW)

Dear Judge Wood:

      We are counsel to Joseph Belmar in the above referenced matter.

      Please accept this letter as a third supplement to the Sentence Memorandum and sentencing letters we previously filed on behalf of Joseph Belmar.  We also submit this letter in reply to the Government's Sentencing Letter dated December 21, 2023 (the "Government's Letter").

### The Government's Characterization of Joseph Belmar

      The Government's Letter characterizes Joseph as having a "long history of violent criminal conduct." (Govt. Letter, p.1).  It claims he has six convictions for "acts of violence."    (p.1). However, this portrayal is somewhat of an overstatement.

      At the outset, the PSR reports five, not six, prior cases.  Three of the five "convictions" were for juvenile cases (ages 13-15).  These matters were handled in New York State Family Court and Joseph was adjudicated a Juvenile Delinquent.  The Government's Letter claims these Juvenile Delinquent adjudications were "felony" convictions.   However, the PSR only reports the initial charges.  It does not report the disposition of these matters.  As such, it is unclear how the Government has deemed these cases "felony convictions."

      The other two cases occurred when Joseph was age 17 and 18.  In both matters, he was adjudicated a Youthful Offender.  One was for a B misdemeanor.  The other was for a felony robbery and he was sentenced to nine months in prison.

Notably, for all five of these cases these are no indications that a weapon was used or that noteworthy injuries were sustained.  (They only reference to injuries are to minor ones such as bruises and swelling).



The Government's Letter also goes to great lengths reporting disciplinary incidents occurring within the jails where Joseph has been held.  However, like the purported references to his prior criminal cases, there is no indication that a weapon was used, drugs or contraband were involved nor anything other than minor injuries were sustained.


**The Distance Between Joseph Belmar and Diala Deli When the Shots Were Fired**

The Government's Letter repeatedly asserts the distance between Joseph and the persons in front of the Diala Deli was a mere 10 - 15 feet.  (The Letter makes this assertion eight times). However, simply repeating an incorrect assertion over and over does not make it correct.

At the outset, the Government's claim that -- according to Investigator Mention's testimony -- Joseph stood adjacent to a crosswalk (near the deli) is belied by an eyewitness who was interviewed by an FBI agent. (A report of the interview is attached as an Exhibit to our letter dated December 4, 2023).  As noted in the report, the witness was in front of an "unmarked store" which was undergoing renovations.  The unmarked store is a "tobacco" store depicted in the photograph submitted as an Exhibit to our December 4th letter.  This store is past the crosswalk, further away from the Diala deli.  While standing in front of the unmarked store, the witness saw Joseph standing in front of a work van parked in front of the unmarked store.  The report clearly indicates the witness, the van and Joseph were all in front of the unmarked store.  Moreover, as noted in the report, Joseph and the witness saw each other.  When this occurred, Joseph made a "be quiet" gesture by putting his finger to his lips.  If Joseph was actually by the crosswalk -- as claimed by the Government's

Letter -- then he would have been past the unmarked store and his back would have been to the witness.  As such, they would have not seen each other as indicated in the report.[1]

In any event, using Google Maps, we measured the distances at issue.  Even using the Government's assertion -- that Joseph was standing in the crosswalk -- confirms that the Government's claim that Joseph's was a mere 10-15 feet away from the Diala deli is inaccurate.  The distance from the crosswalk to the Diala Deli (measured from the midpoint of each one) is 43.25 feet.  (A copy of a Google Maps measurement is attached).  For reference, the measurement between the unfinished store and the Diala Deli (from the midpoint of each one) is 58.42 feet.  Under either scenario, these measurements confirm that Investigator Menton's hearing testimony -- where he estimated this distance being a mere 10-15 feet -- was inaccurate.

This erroneous recollection, by Investigator Menton, further supports our contention -- set forth in our December 5th letter -- that his ability to accurately to recall and describe the incident was impaired by the sudden and quick nature of the incident coupled with his simultaneously reaching for his gun and trying to open his car door.  As indicated in our prior submissions, the tangible evidence in this case (the bullet hole in the window) demonstrates the gun was aimed far above the people in front of the deli.  This is no forensic evidence to support the claim -- by Investigator Menton and the Government -- that the gun was pointed straight ahead and it was a "miracle" no one was hit.

### There is Insufficient Evidence of Intent to Kill and Malice Aforethought

We have addressed this issue in our prior submissions.  The tenor of Government's Letter seems to imply the Court should draw an inference that shooting "at" someone is tantamount to having malice aforethought and an intent to kill another person.  However, in the SDNY cases we previously cited, Chief Judge Swain, along with Judges Stanton, Buchwald, Cote and Daniels, declined to accept this premise.  The Government's Letter tries to distinguish these cases from the matter at bar.  However, in all these cases, like the matter at bar, the defendant shot at another person (or persons) and, in some instances, was at much closer range.  In one instance the range was point blank and a person was actually shot.  Yet, in all these cases, the Courts declined to accept the Government's arguments that the conduct constituted attempted murder.

Moreover, the position advocated by the Government here -- and its claim that a maximum sentence is warranted due to gun shots being fired on "crowded city streets" and  "gun violence plaguing this District" (p.25) -- is disparate from the position it has taken in other cases referenced in our Sentencing Memorandum.  For example, in *McKenzie,* the defendant was paid $20,000 to fire

---

[1]

The Government's Letter seems to imply the report is not accurate by twice referring it to as a "hearsay" report.  (pp. 5,7, fn. 3,4).  However, the Government's Letter acknowledges, that for purposes of this proceeding the Court may rely upon hearsay.  (p.11).

at someone in the always crowded Times Square.  Yet, in that case, the Government did not assert ten years was an appropriate sentence (it urged for 46-57 months).  Similarly, in *Alston/Williams*, the defendants engaged in a gun battle on the street outside of Madison Square Garden.  Yet, in those cases, the Government did not assert ten years was and appropriate sentence (it urged 27-33 months and 46-57 months, respectively).

### The Hospital Statement

We contend the statement Joseph purportedly made at the hospital does not support the Government's claim that he acted with malice aforethought and with an intent to kill.  As we previously discussed, he is only alleged to have stated he shot "at" the people in front of the deli.  There is no claim that he affirmatively stated he was trying to kill anyone.

In any event, we urge the Court to use caution in deciding how much weight should be given to the statement.  At the time he was interviewing Joseph in the hospital, Investigator Menton was an experienced NYPD detective.  He deliberately chose to not record the interview.  He could have brought a recording device when he went there.  He chose not to.  He could have recorded it with his cell phone.  He chose not to.  We submit, his claim that there is a policy against using a cell phone to make a recording is mere pretext.  Notably, New York Law Criminal Procedure Law §60.45 requires custodial interviews to be recorded when defendants are charged with serious crimes.  This law was passed in response to police coercion which sometimes occurred during unrecorded interrogations, especially high profile matters.[2]  Although §60.45 provides a hospital interview can be deemed good cause to excuse the recording requirement, the deliberate decision of Investigator Menton to not record it places a cloud over the circumstances of the interview.  Joseph was injured to the extent that he needed to be hospitalized. ███████████████████

Against this backdrop, the Government's Letter urges the Court to accept a premise that since Joseph did not expressly state -- during the hospital interrogation -- that he only wanted send a message, that the rational inference is that he intended to kill.  (p. 14).  However, this logic can be restated in the opposite, to contend that since he did not say he intended to kill, that the rational inference is that lacked such intent.  However, since Investigator Menton intentionally declined to engage in a more appropriate practice of recording the interview, all favorable inferences should be drawn in favor of Joseph.

---

[2]

For background we refer the Court to these articles:
https://innocenceproject.org/new-york-state-law-video-recording-interrogations-takes-effect/
https://www.nytimes.com/2019/08/01/opinion/police-interrogations-confessions-record.html

### Medical Needs and Conditions

In our Sentence Memorandum, we reported that Joseph has been constantly on "lockdown" and has not even been outside during the entire period of his incarceration. We indicated this has a highly debilitating impact upon his mental health. In response, the Government does not address the impact of prolonged lockdowns. Instead, the Government's Letter somewhat indifferently claims Joseph "is receiving more than adequate treatment for all his conditions." (p. 25). As such, the Government Letter's seems to assert that keeping a Joseph under what is tantamount to constant solitary confinement, pumping him full of medications and having him briefly see a counselor every thirty days is a "more than adequate" way to treat his severe serious mental health disorders. However, earlier today, in *U.S. v. Chavez*, 22 cr 303 (JMF), Judge Furman issued an opinion and order which, to the contrary, indicates that prison lockdowns -- as a matter of practice -- are intolerable. In pertinent part he writes:[3]

> [I]nmates at the MDC spend an inordinate amount of time on "lockdown"     that is, locked in their cells, prohibited from leaving for visits, calls, showers, classes, or exercise. (In Orwellian fashion, the Bureau of Prisons does not refer to these periods as "lockdowns"; instead, it refers to them as "modified operations." [citation omitted]. But there is no mistaking what the practice entails.) As of the date of this Opinion and Order, inmates at the MDC have reportedly been on lockdown for much or all of the last three weeks following an assault on staff, with a maximum of "two hours outside their cells each day" during a short reprieve. [citations omitted]. For far longer, lockdowns have been especially common on weekends and holidays. [citation omitted] ("[P]eople who are detained at the MDC are not allowed out of their cells pretty much at a minimum three days of the week, Friday, Saturday, Sunday . . . .").
>
> . . .
>
> Regardless, confining inmates to their cells is, for at least some inmates, tantamount to solitary or near-solitary confinement, a practice that is increasingly viewed as inhumane. *See Johnson v. Prentice*, 144 S. Ct. 11, 12 (2023) (Jackson, J., dissenting from denial of certiorari) ("As Members of this Court have recognized, the practice of solitary confinement 'exact[s] a terrible price.'" [citations omitted] (considering a "comprehensive meta-analysis of the existing literature on solitary confinement" that concluded that solitary confinement is "psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term . . . damage"). 22 cr 303 (JMF) ECF Doc. 31, p. 9-10.

---

[3]

Judge Furman's Opinion and Order refers to practices at MDC. However, as noted in our Sentencing Memorandum, Joseph is on near constant lockdown at Hudson.

### The Criminal History Calculation

In our Sentence Memorandum, and Sentencing Letter dated November 6, 2023, we contended the Presentence Investigation Report ("PSR"), at ¶38, erroneously applied three criminal history points for Joseph having a New York State conviction for Criminal Sale of a Controlled Substance in the Third Degree. Pursuant to this conviction, on November 25, 2019, Joseph was sentenced to a term of 24 months Direct Parole, a non-incarceration sentence.

The PSR (at ¶38) informs that, on December 15, 2020, when Joseph was still on parole, he was placed in custody, for a parole violation. It informs his parole was revoked, on April 20, 2021.

The PSR alleges that pursuant to the parole violation, Joseph was sentenced to a term of 24 months. This allegation is wrong. In support of the PSR, the Government's Letter claims it reviewed Joseph's "rap sheet" and this 24 month jail sentence is reported on it. (p.25). This does not appear to be correct. Attached as an Exhibit to this letter is an excerpt from the rap sheet which was provided to us. It only reports the imposition of a sentence of 24 months to Direct Parole. It does not report Joseph was sentenced to 24 months imprisonment for a parole violation.

Even if there are reports which state Joseph was sentenced to 24 months for his parole violation, it would be unlawful for him to have been sentenced to this term of imprisonment. Pursuant to 9 NYCRR 8005.20(c)(1), the maximum sentence which can be imposed, for the most severe parole violation, is "a hold to the maximum expiration of the sentnece." Accordingly, since the maximum expiration date of Joseph's parole was November 25, 2021, the maximum sentence which could have been imposed upon him was the approximately 11 ½ months remaining on his parole term (the period from December 15, 2020, when he was placed in custody, through the November 25, 2021 expiration date).

As set forth in our Sentence Memorandum, and November 6th Letter, the basis for the parole revocation was the offense conduct in this case. As such, since the conduct underlying the parole revocation is relevant conduct, the imposed (11 ½ month) sentence should not be counted in the calculation of Joseph's CHC. *See*, USSG §4A1.2, Application Note 1. Accordingly, the 11 ½ month term he served -- for the parole violation -- should not be applicable to the determination of criminal history points applicable to this offense. As a result, only one criminal history point should be applied to this offense.

Even assuming *arguendo*, that the 11 ½ month term applies toward the determination of the criminal history points applicable to this offense, Joseph would still only be subject to two criminal history points pursuant to USSG §4A1.1(b) (not three criminal history points as alleged in the PSR).

Under either scenario, whether one or two criminal history points are attributed to this offense, Joseph's CHC is III not IV as alleged in the PSR.

## Acceptance of Responsibility

Joseph pled guilty and accepts responsibility.  We submit the Court should not credit the Government now claiming that Joseph -- in stating his mind was "manipulated" when it is documented that he suffers from severe mental illness to the point that he hears voices and has hallucinations -- should be denied acceptance of responsibility.  In addition, he has informed that during the next court appearance, he will withdraw his recent letter where he requests appointment of new counsel.

## The Government's Alternative USSG Calculation

The Government's Sentencing Letter provides, in the event the Cross Reference does not apply, an alternative calculation to Joseph's advisory Sentencing Guidelines.  (p. 21).  Prior to the this point, the Government never offered any such alternative calculation.  Similarly, the PSR never offered any such alternative calculation.  The Government's Letter agrees with our assertion that Joseph's Base Offense Level is 20.  The Government's Letter also asserts that a four level enhancement, per USSG 2K2.1(b)(6)(B), is applicable due to the underlying conduct constituting Reckless Endangerment in the First Degree, a felony offense, in violation of New York Penal Law. We agree this enhancement is applicable based upon the circumstances of the matter at bar.

However, for the reasons stated above, we disagree with the Government's contention that Joseph is not longer entitled to acceptance of responsibly or that he is in CHC IV.

Based upon the foregoing, and our prior submissions, we now contend Joseph's advisory Sentencing Guidelines should be calculated as follows:

| | |
|---|---|
| Base offense Level<br>per USSG 2K2.1(a)(4)(A)<br>Due to having a conviction for a prior crime of violence - Robbery in the Second Degree (referenced at PSR ¶36) | 20 |
| Plus:  USSG 2K2.1(b)(6)(B) due to the underlying conduct constituting a felony offense | 4 |
| Less: Acceptance of Responsibility (PSR ¶¶29-30) | -3 |
| Total Offense Level (TOL) | 21 |
| Advisory Sentencing Guideline range based upon TOL 21 and CHC III | 46-57 mos |

Respectfully submitted,
/s/
Jeffrey G. Pittell

cc:     Joseph Belmar
        James Ligtenberg, AUSA

**EXHIBITS**

| Item | Page |
|---|---|
| ███████████████ | |
| ██████████████████ | ██ |
| ██████████████████████ | ██ |
| ████████████ | █ |
| | |
| Images from Google maps | |
| Distrance between unmarked (tobacco) store and deli | 7 |
| Distance between crosswalk and deli | 8 |
| | |
| Excerpt from Criminal History Report | 9-13 |

Google Maps    ZA TOBACCO SHOP



Map data ©2024 , Map data ©2024 Google    20 ft

Measure distance
Total distance: 58.42 ft (17.81 m)

Google Maps   ZA TOBACCO SHOP



Imagery ©2024 Airbus, Bluesky, Maxar Technologies, Map data ©2024 Google    20 ft

Measure distance
Total distance: 43.25 ft (13.18 m)

## Repository Inquiry

**To: omalleyd1 For: Daniel OMalley Case No:FBITF NYSID Number - 02816629Q - CRI**

New York State Division of Criminal Justice Services
Alfred E. Smith Building, 80 South Swan St.
Albany, New York 12210. Tel:1-800-262-DCJS
Michael C.Green, Executive Deputy Commissioner of the NYS Division of Criminal Justice Services

**Identification    Summary    Criminal History    Job/License    Wanted    Missing**

## ● Attention - Important Information ▲

* See **Additional Information** at the bottom of this response for more banners pertaining to the criminal history

PAROLE ABSCONDER

**This NYSID Number 2816629Q was used previously and is now reassigned to this individual.**

**Wanted information included in this record.**

**Currently under community supervision by the New York State Department of Corrections and Community Supervision.** Please contact the Community Supervision Operation Center (CSOC) at (212) 239-6159 or (800) 660-9890, Department of Corrections and Community Supervision, 314 West 40th Street, NY, NY 10018. The Community Supervision Operation Center (CSOC) is operational 24 hours a day, seven days a week.

**DNA PROFILE IS ON FILE IN THE DNA DATABANK** If more information is required call DCJS Office of Forensic Services at 1-800-262-3257

## ● Identification Information ▲



Cycle 2
Arrest Date December 30, 2018

**Name:**

JOSEPH BELMAR

**Date of Birth:**

September 13, 1997

**Place of Birth :**

New York

**Address:**

1510 UNIONPORT ROAD, BRONX, NY 10462

1510 UNIONPORT ROAD, BRONX, NY

| Sex: | Race: | Ethnicity: | Skin Tone: |
|------|-------|-----------|-----------|
| Male | Black | Not Hispanic | Light/Dark/Medium |
| **Eye Color:** | **Hair Color:** | **Height:** | **Weight:** |
| Brown | Black | 5' 10" | 200 |

---

**SSN:**

**NYSID#:** 02816629Q   **FBI#:** M1TK1HJWK   **NCIC Classification#:**

**III Status:** Criminal record in other states or in multiple FBI files for NYS

---

## 🟢 Summary Information 🔺

**Total Arrests:** 2   **Date of Earliest Arrest:** November 01, 2016   **Latest Prior Arrest Date:** December 29, 2018

| Total Arrests: | 2 |
|----------------|---|
| Felony: | 2 |
|   Violent Felony: | 0 |
|   Firearm: | 0 |
| Misdemeanor: | 0 |
| Other: | 0 |

| Total Arraigned Arrests: | 2 |
|--------------------------|---|
| Felony: | 2 |
|   Violent Felony: | 0 |
|   Firearm: | 0 |
| Misdemeanor: | 0 |
| Other: | 0 |

| Total Open Cases: | 0 | Cycles (max 5) |
|-------------------|---|----------------|
| Felony: | 0 | |
|   Violent Felony: | 0 | |
| Misdemeanor: | 0 | |
| Other: | 0 | |
| Open ACD: | 0 | |
| Non Docketed Cases: | 0 | |

---

| Total Convictions: | 2 | Cycles (max 5) |
|--------------------|---|----------------|
| Felony: | 2 | 2,1 |
|   Violent Felony: | 0 | |
|   Firearm: | 0 | |
| Misdemeanor: | 0 | |
| Other: | 0 | |
| YO Adjud.: | 0 | |

| Warrant Information: | | Cycles (max 5) |
|----------------------|---|----------------|
| Failure to Appear Counts: | 0 | |
| Total Open: | 0 | |
| Active NYC: | 0 | |

| DOC Classification: | | Cycles (max 5) |
|---------------------|---|----------------|
| Escape Charges: | 0 | |
| Sex Offender Convictions: | 0 | |
| Probation Revoc: | 0 | |
| Parole Revoc: | 0 | |

**Note:** Summary Information may not reflect official actions. DCJS strongly urges the recipient to review the enclosed criminal history record information.

---

## 🟢 NYS Criminal History Information 🔺

### 🔻 Cycle 3

**No Arrest Reported**

**No Court Reported Information**

## Incarceration/Supervision Information

### Parole Release Information

| | |
|---|---|
| **Received by Parole on:** | November 26, 2019 |
| **Release Type:** | Sentenced to Parole |
| **Max Expiration Date:** | January 17, 2022 |
| **Supervision Office:** | Out-of-State |
| **Parole ID Number:** | 20A0183 |
| **Name:** | JOSEPH BELMAR |

---

⬇ **Cycle 2** ⬆

## Arrest/Charge Information

Arrest Date: December 29, 2018 04:10 pm (16:10:00)

| | |
|---|---|
| **Name:** | JOSEPH BELMAR |
| **Date of Birth:** | September 13, 1997 |
| **Sex:** | Male |
| **Race:** | Black |
| **Ethnicity:** | Not Hispanic |
| **Height:** | 5' 10" |
| **Weight:** | 200 |
| **Age at time of crime/arrest:** | 21 |
| **Address:** | 1510 UNIONPORT ROAD, BRONX, NY 10462 |
| **Fax Number:** | M46432 |
| **Place of Arrest:** | NYCPD 28 |
| **Arrest Type:** | Unknown |
| **Date of Crime:** | December 29, 2018 |
| **Place of Crime:** | New York County, NY |
| **Criminal Justice Tracking No.:** | 68863163M |
| **Arresting Agency:** | NYCPD PCT 028 |
| **Arresting Officer ID:** | 948138 |
| **Arrest Number:** | M18664797 |
| **Arraignment:** | New York County Criminal Court |

**Arrest Charges:**

-- Criminal Possession Contr Sub-3rd:Narc Drug Intent To Sell

PL 220.16      Sub 01          Class B Felony          Degree 3 NCIC 3599

-- Criminal Sale Controlled Substance-3rd:Narcotic Drug

PL 220.39      Sub 01 Counts: 9 Class B Felony          Degree 3 NCIC 3599

USAO_000011

12

-- Resisting Arrest

    PL 205.30                          Class A Misdemeanor Degree 0 NCIC 4801

-- Unlawful Possession Of Marihuana

    PL 221.05                          Violation      Degree 0 NCIC 3562

## Court Case Information

**--Court:** New York County Criminal Court   **Case Number:** 2018NY049104

December 30, 2018
**Initial Report Of Docket Number**

December 30, 2018
**Arraigned**

    -- Criminal Possession Contr Sub-3rd:Narc Drug Intent To Sell

        PL 220.16     Sub 01          Class B Felony     NCIC 3599

    -- Criminal Sale Controlled Substance-3rd:Narcotic Drug

        PL 220.39     Sub 01 Counts: 8 Class B Felony     NCIC 3599

    -- Criminal Sale Controlled Substance-5th Degree

        PL 220.31          Counts: 2 Class D Felony     NCIC 3599

    -- Unlawful Possession Of Marihuana

        PL 221.05          Violation NCIC 3562

January 04, 2019
**Transferred To Superior Court**

    -- Criminal Possession Contr Sub-3rd:Narc Drug Intent To Sell

        PL 220.16     Sub 01          Class B Felony     NCIC 3599

    -- Criminal Sale Controlled Substance-3rd:Narcotic Drug

        PL 220.39     Sub 01 Counts: 8 Class B Felony     NCIC 3599

    -- Criminal Sale Controlled Substance-5th Degree

        PL 220.31          Counts: 2 Class D Felony     NCIC 3599

    -- Unlawful Possession Of Marihuana

        PL 221.05          Violation NCIC 3562

January 04, 2019
**Not Arraigned**

USAO_000012

13

-- Criminal Sale Controlled Substance-3rd:Narcotic Drug
PL 220.39     Sub 01   Class B Felony         NCIC 3599

-- Resisting Arrest
PL 205.30                 Class A Misdemeanor NCIC 4801

**--Court:** New York County Supreme Court   **Case Number:** 00008N-2019

January 22, 2019
**Initial Report Of Indictment Number**
-- Criminal Sale Controlled Substance-3rd:Narcotic Drug
PL 220.39    Sub 01 Counts: 8 Class B Felony NCIC 3599

November 26, 2019
**Convicted Upon Plea Of Guilty** - Conviction Date: September 25, 2019

-- Criminal Sale Controlled Substance-3rd:Narcotic Drug
PL 220.39                 Sub 01          Class B       Felony        NCIC 3599

**In Full Satisfaction of:**
-- Criminal Possession Contr Sub-3rd:Narc Drug Intent To Sell
PL 220.16       Sub01   Class B   Felony   NCIC 3599

-- Criminal Sale Controlled Substance-3rd:Narcotic Drug
PL 220.39 Sub01 Counts: 7 Class B Felony NCIC 3599

-- Criminal Possession Narcotic Drug-4th
Degree
PL 220.09  Sub01  Class C Felony NCIC 3599

-- Criminal Sale Controlled Substance-5th Degree
PL 220.31  Counts: 2 Class D Felony NCIC 3599

**Sentenced to:**   Term: Direct to Parole 2 Year(s) Post Release Supervision Time: 2 Year(s)
**Sentence Date:** November 26, 2019

**Interim release Status:** Remanded without bail

## Cycle 1 ⬆

**Arrest/Charge Information**
Arrest Date: November 01, 2016 03:36 pm (15:36:00)