UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA

                -against-

JOSEPH BELMAR,

                          Defendant.

-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 31, 2024

21-CR-16 (KMW)

**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

Defendant Joseph Belmar pleaded guilty to being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). (Presentence Investigation Report ("PSR") ¶¶ 2–3, ECF No. 50.)  The question presented here is whether Belmar used his gun to attempt to commit murder, because, if he did, the attempted murder Guideline applies.

For the reasons set forth below, the Court finds that the Government has not proven by a preponderance of the evidence that Belmar had a specific intent to kill when he fired 6–7 shots in the direction of rival gang members, which intent is required for the attempted murder Guideline to apply.  The Court finds, however, that Belmar used a firearm and ammunition in committing reckless endangerment in the first degree, in violation of N.Y. Penal Law § 120.25.  Accordingly, the Court will apply a four-level enhancement to Belmar's base offense level pursuant to Section 2K2.1(b)(6)(B).

1

## BACKGROUND

### I. December 11, 2020 Shooting[1]

Belmar was a member of Sex Money Murder ("SMM"), a Bloods gang. (*See Fatico* Tr. at 42:19; GX 11 at 1 (advising law enforcement that he was "an active member" of SMM); GX 20 (texting the SMM "Oath" to a contact in his phone).) On December 8, 2020, two members of SMM, Polo and Smoove (or "Millions"), were involved in an altercation with a rival street gang near 162nd Street and 3rd Avenue in the Bronx, NY. (*See* GX 11 at 1–2; GX 23; Gov't Sent'g Letter at 4, ECF No. 63.) The rival street gang attacked Smoove with a bike chain, and Smoove was left in critical condition. (GX 11 at 2.) After the incident, Smoove received treatment at Lincoln Medical and Mental Health Center. (*Id.*)

On December 9, 2020, Belmar received a text message informing him that "Smoove n polo got jumped." (*See* GX 21; *see also* GX 22 (receiving another text message describing the incident).) On December 10, 2020, Belmar texted a contact stating that he was about to "respectfully go [back] to jail." (*See* GX 23.)

On December 11, 2020, at approximately 9am, Belmar texted a contact that his "buzzen [is] in the hospital fighting for [his life]."[2] (*See* GX 24.) At approximately 3:30pm, Belmar conducted several Google searches in which he searched: "do achoal kill fingerpring off guns," i.e., does alcohol remove fingerprints from guns. (*See* GX 25.) Shortly after 6:00pm, Belmar and Polo arrived near where Smoove was attacked two days earlier. (*See* GX 11 at 1–2.) Rival gang members were standing down the street. (*Id.*) At the time, Belmar wore a mask and

---

[1] The Court makes the following findings of fact based on a preponderance of the evidence. *See e.g.*, *United States v. Thorn*, 317 F.3d 107, 117 (2d Cir. 2003) ("Facts relied on in sentencing need be established by a preponderance of the evidence."). References to "GX" refer to Government exhibits introduced at the *Fatico* hearing held on November 15, 2023.

[2] Investigator James Menton testified at the *Fatico* hearing that "buzzen" is used by the Bloods when referring to a "cousin," because the Bloods prefer not to use the letter "c." (*Fatico* Tr. at 59:13–60:11.)

gloves, (*Fatico* Tr. at 38:7–12), and Polo provided him with a gun. (GX 11 at 1.) A witness observed Belmar "hiding from sight in front of a white work van" before Belmar fired his gun. (*See* Def's Dec. 4 Letter Ex. 2, ECF No. 61.) When Belmar saw the witness, he "signaled with a finger in front of his masked lips as to say 'be quiet' and then got onto the sidewalk." (*Id.*)

When Belmar reached the Panda Restaurant,[3] he fired 6–7 shots in the direction of members of the rival street gang. (*Fatico* Tr. at 25:24–26:20, 27:19–21.) The members of the rival street gang were in front of the Diala Deli. (*Id.* at 27:19–21; GX 4.)



At the time of the shooting, Investigator James Menton and other law enforcement were conducting surveillance in the vicinity on an unrelated matter. (PSR ¶ 8.) When Belmar opened fire, Investigator Menton was in an unmarked police vehicle directly across from where Belmar was standing. (*See Fatico* Tr. at 22:21–23:5.) Investigator Menton heard, but did not see, Belmar fire the first two shots. (*Id.* at 23:12–15, 25:24–26:6.) Investigator Menton testified that

---

[3] Belmar claims that he was standing in front of, not the Panda Restaurant, but rather the tobacco shop depicted in GX 4, which is farther from the Diala Deli than is the Panda Restaurant. (*See* Def.'s Dec. 4 Letter at 3–4.) The Government disputes Belmar's claim. (Gov't Sent'g Letter at 5 & n.3.)

after hearing Belmar fire the first two shots, Investigator Menton then saw Belmar (who, he testified, was in a "shooter" stance) fire an additional 4–5 bullets.[4] (*Id.* at 24:7–9, 26:1–3.) Investigator Menton testified that Belmar was 10–15 feet[5] away from the rival gang members when he fired his gun, and that Belmar fired "directly at" them, rather than "up in the air." (*Id.* at 23:12–22, 24:23–25:1, 29:23–30:2.) Investigator Menton testified also that the shooting occurred on a "crowded street" in a "busy" commercial and residential neighborhood. (*Id.* at 37:21–38:6; Conf. Tr. at 7:14–7:22, ECF No. 65.)

After firing 6-7 shots, Belmar ran away. (*See* PSR ¶ 8.) Investigator Menton and other law enforcement officers chased and apprehended Belmar. (*Id.* ¶ 9.) The rival gang members followed Belmar and law enforcement, and yelled: "why did you try to kill me, why did you try to kill me, you tried to kill us." (*Fatico* Tr. at 42:5–10.) Belmar responded: "S Double M! S Double M!" (*Id.* at 42:14–17; PSR ¶ 9.)

Later, Investigator Menton and another law enforcement officer interviewed Belmar. During the interview, Belmar stated, among other things, that he was "shooting at [] two males," and that the "shooting incident was [in] retaliation" against the rival street gang for having attacked Smoove. (*See* GX 11 at 1–2.)

## II. The Sentencing Guidelines

The relevant Guideline for Belmar's offense is 2K2.1.

The Government contends that the Court should "cross-reference" the attempted murder Guideline, Section 2A2.1, in calculating Belmar's offense level and Guideline range. (Gov't Sent'g Letter at 12.) Pursuant to Section 2K2.1(c), if a defendant "used or possessed any firearm

---

[4] One bullet hole was found in the Diala Deli's glass vestibule approximately 9 feet above ground, but no evidence of the other 5–6 bullets was found. (Gov't Sent'g Letter at 15–16; Def.'s Nov. 6 Letter at 6, ECF No. 60.)
[5] During cross examination, Investigator Menton testified that his estimate of the distance was "probably" incorrect. (*See Fatico* Tr. at 73:3–16.)

4

or ammunition cited in the offense of conviction in connection with the commission or attempted commission of another offense," Section 2X1.1 applies "in respect to that other offense, if the resulting offense level is greater than" the offense level resulting from the application of U.S.S.G. § 2K2.1(a)–(b). *See* U.S.S.G. § 2K2.1(c)(1)(A). Section 2X1.1 provides that "[w]hen an attempt . . . is expressly covered by another offense guideline section, apply that guideline section." *Id.* § 2X1.1(c)(1). The Government contends that the Court should apply Section 2A2.1 because Belmar used or possessed a firearm and ammunition in the attempted commission of first-degree murder, and the application of Section 2A2.1 results in an offense level greater than that provided for by Section 2K2.1(a)–(b). (*See* Gov't Sent'g Letter at 12; PSR ¶¶ 4, 22.)

The parties do not dispute that, if the Court finds that the attempted murder Guideline does not apply, the Court should apply a four-level enhancement to Belmar's base offense level pursuant to Section 2K2.1(b)(6)(B), because Belmar used or possessed a firearm in connection with committing reckless endangerment in the first degree, in violation of N.Y. Penal Law § 120.25. (Gov't Sent'g Letter at 21; Def.'s Jan. 4 Letter at 7, ECF No. 64.)

## LEGAL STANDARD

### I. Attempted Murder

Federal law defines murder as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). First-degree murder is murder (1) "perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing"; (2) "committed in the perpetration of, or attempt to perpetrate," certain offenses; or (3) "perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed." *Id.* "Any other murder is murder in the second degree." *Id.*

For the first-degree attempted murder cross reference to apply, the Government must establish by a preponderance of the evidence that the defendant had a specific intent to kill, *Braxton v. United States*, 500 U.S. 344, 351, n.* (1991) (internal quotation marks omitted); *United States v. Kwong*, 14 F.3d 189, 194 (2d Cir. 1994), and acted with premeditation, *United States v. Cespedes*, No. 11-CR-1032, 2015 WL 4597539, at *3 (S.D.N.Y. July 30, 2015) (Engelmayer, J.) (collecting cases); *United States v. Spurgeon*, 117 F.3d 641, 643 (2d Cir. 1997) (per curiam) (explaining that it is the Government's burden to establish by a preponderance of the evidence that the defendant committed an offense relevant to the Guidelines calculation). "Premeditation requires a 'cool mind' that is capable of reflection and some appreciable time for reflection and consideration before execution of the act." *Cespedes*, 2015 WL 4597539, at *3 (internal quotation marks omitted); *see also United States v. Lucas*, No. 19-CR-467, 2023 WL 4209628, at *2 (E.D.N.Y. June 26, 2023) (Brodie, C.J.) (explaining that "[w]hat is important is not the amount of time that elapsed, but only that the defendant deliberates before committing the fatal act").

Both specific intent to kill and premeditation may be inferred from circumstantial evidence. *See Kwong*, 14 F.3d at 194 ("By necessity, intent must usually be proven by circumstantial evidence"); *United States v. Whiteside*, 207 F. Supp. 3d 311, 320–21 (S.D.N.Y. 2016) (Crotty, J.) (stating that "relevant circumstantial evidence [with respect to premeditation] includes 'planning activity,' 'motive,' and the 'nature of the killing'").

## II. Reckless Endangerment in the First Degree

Pursuant to N.Y. Penal Law § 120.25, "[a] person is guilty of reckless endangerment in the first degree when, under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person." N.Y. Penal

Law § 120.25.  "[D]epraved indifference to human life is a 'culpable mental state.'" *United States v. Legros*, 529 F.3d 470, 475 (2d Cir. 2008) (quoting *People v. Feingold,* 852 N.E.2d 1163, 1167 (N.Y. 2006)).  "'Grave risk of death to another person' means endangerment of someone *other* than a defendant's target." *See United States v. Crocker*, No. 13-CR-414, 2021 WL 6051083, at *4–5 (S.D.N.Y. Dec. 20, 2021) (Stein, J.) (emphasis in original).  Before imposing an enhancement for reckless endangerment in the first degree, the Court must find that the defendant's "conduct created a 'grave risk of death' and that he acted with a *mens rea* of 'depraved indifference to human life.'" *Legros*, 529 F.3d at 475 (emphasis in original).

## DISCUSSION

The Government has failed to establish by a preponderance of the evidence that Belmar had a specific intent to kill the rival gang members and, therefore, the attempted murder Guideline does not apply.  However, the evidence establishes that Belmar used a firearm and ammunition in connection with committing reckless endangerment in the first degree, in violation of N.Y. Penal Law § 120.25.  In calculating Belmar's offense level, the Court will apply a four-level enhancement for reckless endangerment, pursuant to Section 2K2.1(b)(6)(B).

### I.   Attempted Murder Cross-Reference

The evidence establishes that Belmar's shooting was premeditated.  First, Belmar admitted that he was motivated to engage in the shooting to retaliate against the rival gang members for having attacked Smoove.  (*See* GX 11 at 1–2; *Fatico* Tr. at 46:19–24.)  Second, Belmar texted a contact stating that he was "respectfully go [back] to jail," and conducted a Google search to determine whether alcohol can remove a person's fingerprints from a gun.  (*See* GX 23; GX 25.)  Third, Belmar wore a mask and gloves and snuck up on his would-be victims before firing.  Taken together, the evidence establishes that Belmar planned to engage in the

shooting in a premeditated manner. *See Cespedes*, 2015 WL 4597539, at *4 (finding premeditation where the "defendants decided to retaliate against a rival gang member[,] spent 10–20 minutes driving to a different part of the Bronx, armed themselves with knives and tools they found in the vehicle, and searched for the rival gang member on foot for 10–15 minutes before launching their attack"); *Lucas*, 2023 WL 4209628, at *2 (finding premeditation where the defendant "drove to the scene of the crime, with a gun, waited behind the apartment building door looking for the victim, exited the building, took aim and began shooting at the victim once he saw the victim").

Even though Belmar engaged in a premeditated shooting, the evidence does not establish that Belmar had a specific intent to kill the rival gang members, which is required for the attempted murder Guideline to apply. To support its claim that Belmar had a specific intent to kill the rival gang members, the Government relies primarily on cases that have inferred that defendants had specific intent to kill when they fired guns when in "close range" relative to their intended victims.[6] Distances of up to 15 to 20 feet have been described as "close range." *See Rice v. Hoke*, 846 F.2d 160, 161, 166 (2d Cir. 1988); Sent'g Tr. at 6:16–7:7 ("*Escort* Sent'g Tr."), *United States v. Escort*, No. 21-CR-387, ECF No. 58 (S.D.N.Y. Feb. 7, 2022) (Cote, J.)

---

[6] *See e.g.*, *United States v. Atehortva*, 69 F.3d 679, 687 (2d Cir. 1995) (affirming finding that a defendant "intended, albeit without premeditation, to murder [] federal agents," when he fired a gun at them repeatedly from "close range"); *United States v. Muyet*, 994 F. Supp. 501, 518 (S.D.N.Y. 1998) (Leisure, J.) (collecting cases finding that a defendant intended to kill when the defendant fired at "close range"); *United States v. Rodriguez*, No. 12-CR-73, 2015 WL 3454725, at *2 (D. Vt. May 29, 2015), *aff'd*, 626 F. App'x 314 (2d Cir. 2015) (summary order) (stating that "firing multiple shots at close range and preventing any mitigation of the damage is sufficient to establish intent to kill"); *United States v. Reid*, No. 22-1279, 2023 WL 8469353, at *2 (2d Cir. Dec. 7, 2023) (summary order) (affirming application of the attempted murder Guideline where a defendant fired one shot at "very close range" and, after firing, chased the victim while still pointing a gun in the victim's direction); *United States v. McBride*, No. 22-814, 2023 WL 4282298, at *2 (2d Cir. June 30, 2023) (summary order) (affirming application of the attempted murder Guideline where a victim testified that the defendant "deliberately shot him from close range following an altercation").

(stating that "[f]ifteen to twenty feet has been found to be [] close range. I don't know what the outer limits might be of that determination").

The Government has not established by a preponderance of the evidence that Belmar was within close range relative to the rival gang members when he fired at them. The Government relies on Investigator Menton's testimony for the proposition that Belmar was within 10–15 feet. (*See* Gov't Sent'g Letter at 7 & n.4.) However, as stated in note 5 *supra*, during cross examination, Investigator Menton stated that his 10–15 feet estimate was "probably" incorrect. (*See Fatico* Tr. at 73:3–16.) Following the *Fatico* hearing, Defense counsel used a tool within Google Maps to measure the distance between the Panda Restaurant and the Diala Deli, and that measurement shows that the distance between the Panda Restaurant and the Diala Deli is approximately 43.25 feet, rather than 10–15 feet.[7] (*See* Def.'s Jan. 4 Letter at 3.)

Thus the Court cannot infer from the distance between Belmar and the rival gang members that he had a specific intent to kill. *See Escort* Sent'g Tr. at 6:16–21, 8:2–9, 9:3–6 (declining to find that a defendant fired from "close range" or that he intended to kill when he fired his gun toward a victim who had been standing at least twenty feet away from him or around "three car lengths apart"); *Lucas*, 2023 WL 4209628, at *2–4 (declining to find intent to kill where a defendant fired a gun from a distance of "at least three cars lengths away" from his intended victim, because the government did not establish that the shooting was at "close range," and there was no other evidence from which to infer his intent); *see generally* Sent'g Tr., *United States v. Powell*, No. 21-CR-205, ECF No. 37 (E.D.N.Y. Mar. 6, 2023) (similarly declining to

---

[7] 43.25 feet might not be the precise distance between the Panda Restaurant and the Diala Deli because Google Maps is sensitive to where the user—here, Defense counsel—places the two points from which measurements are to be drawn. (*See* Conf. Tr. at 7:23–8:6.) Although the Court believes that the distance between the Panda Restaurant and the Diala Deli may be less than 43.25 feet, the Court finds that Defendant's characterization of the distance is more accurate than the Government's.

9

find intent to kill).

To support its claim that Belmar intended to kill the rival gang members, the Government points also to Belmar's motive; that Belmar wore a mask and gloves; that he snuck up on his intended victims; that he fired 6–7 shots; Investigator Menton's observation that Belmar fired his gun "directly at" his intended victims; and the rival gang members' and Belmar's statements. (Gov't Sent'g Letter at 14–15.) This evidence does not establish that Belmar intended to kill, rather than injure, scare, or send a message to the rival gang members, for the following reasons.

First, Belmar's motive to retaliate against the rival gang members is not sufficient to establish a desire to kill them. The Government points to the fact that Belmar snuck up on his intended victims and wore a mask and gloves as evidence that Belmar intended to kill. (*See id.*) The Government contends that these actions are inconsistent with the notion that Belmar was trying to send a message, because if Belmar had concealed his presence and his affiliation with SMM successfully, the rival gang could not know that Belmar had sought to send them any message. (*Id.*) However, it is equally plausible, for example, that Belmar snuck up on the rival gang members and wore a mask and gloves to avoid identification by law enforcement, and that SMM could have taken credit for the shooting after Belmar was safely away from the scene.

In addition, the Government contends that Belmar's firing of 6–7 shots, rather than 1–2 shots, is inconsistent with the notion that Belmar sought to send a message. (*Id.* at 15.) The Government cites *United States v. Green*, in which Judge Kaplan found that, given that a defendant fired six shots, he could not have been merely firing warning shots, because firing six warning shots "makes no sense at all." Sent'g Tr. at 10:3–7, No. 21-CR-431, ECF No. 55 (Kaplan, J.). The court reasoned that "[y]ou don't fire six warning shots. You don't fire them at a level that's roughly equivalent to the torso of a human being on the sidewalk rather than up in

10

the air." *Id*. Although Belmar's firing of 6–7 shots is arguably inconsistent with the notion that he sought merely to send a message, *Green* is distinguishable because there is no evidence that Belmar's bullets landed at a height capable of injuring the rival gang members. *See id.* at 6:18–22, 8:9–16; *United States v. Green*, No. 22-800-CR, 2023 WL 7180645, at *1–2 (2d Cir. Nov. 1, 2023) (summary order) (affirming district court's application of the attempted murder Guideline.)

Second, and relatedly, Investigator Menton's testimony that Belmar shot "directly at" the rival gang members may be inaccurate, owing to the angle from which Investigator Menton observed the shooting. The shooting was over in seconds. (*Fatico* Tr. at 73:12–16.) In that brief period, Investigator Menton had to process that a shooting was underway and respond quickly. It would not be surprising if Investigator Menton were unable to ascertain the precise angle at which Belmar was shooting.

Third, that the rival gang members yelled "why did you try to kill me, why did you try to kill me, you tried to kill us," and that Belmar stated "he was shooting *at* [] two males" in his post-arrest interview do not demonstrate Belmar's intent to kill. The rival gang members' statements do not provide insight into Belmar's intent. If anything, the rival gang members' statements demonstrate a reasonable reaction to Belmar having fired a gun in their direction regardless of Belmar's intent. Belmar's post-arrest statement, moreover, could be interpreted as Belmar stating that he shot in the rival gang members' direction, but not necessarily to kill them.

Because the Court can infer equally from the evidence that Belmar intended to injure, scare, or send a message to the rival gang members rather than kill them, the Court declines to apply the attempted murder Guideline.[8]

---

[8] The Court does not address the Government's argument that the second-degree attempted murder Guideline should apply in the alternative. (Gov't Sent'g Letter at 21.) Both first- and second-degree attempted murder require the

11

## II.   Reckless Endangerment in the First Degree Enhancement

The Court finds that Belmar used or possessed a firearm and ammunition in connection with the commission of reckless endangerment in the first degree, in violation of N.Y. Penal Law § 120.25.  The evidence establishes that Belmar (1) arrived near the intersection of 162nd Street and 3rd Avenue having planned to fire a gun to retaliate against the rival gang members; and (2) fired 6–7 shots on a crowded street in the early evening.[9]  In engaging in this conduct, Belmar created a grave risk of death to innocent bystanders and evinced a depraved indifference to human life.  *See Escort* Sent'g Tr. at 4:18–5:3, 7:8–8:1, 16:9–13 (applying an enhancement for reckless endangerment where a defendant fired his gun on a commercial street when pedestrians and car traffic were present).

---

Court to find by a preponderance of the evidence that Belmar had a specific intent to kill.  Because the Government has not proven by a preponderance of the evidence that Belmar had a specific intent to kill, neither the first-degree nor the second-degree attempted murder Guideline applies.

[9] Although the Court cannot credit Investigator Menton's observation that Belmar shot "directly at" the rival gang members, for the reasons cited *supra*, the Court credits Investigator Menton's observation that Belmar did not shoot "up in the air."

## CONCLUSION

For the foregoing reasons, the Court finds that the attempted murder Guideline does not apply. However, in calculating Belmar's offense level and Guideline Range, the Court will apply a four-level enhancement pursuant to Section 2K2.1(b)(6)(B) because the Court finds that Belmar committed reckless endangerment in the first degree, in violation of N.Y. Penal Law § 120.25. The parties' remaining disputes relating to Belmar's criminal history, acceptance of responsibility, and alleged obstruction of justice will be resolved prior to sentencing.

SO ORDERED.

Dated: New York, New York
May 31, 2024

*/s/ Kimba M. Wood*
KIMBA M. WOOD
United States District Judge